**UNIVERSAL FROZEN FOODS, CO., formerly known as Rogers Walla Walla, Inc., an Oregon corporation, Plaintiff,**

v.

**LAMB–WESTON, INC., an Oregon corporation, Defendant.**

**Civ. No. 86–1212–RE.**

United States District Court, D. Oregon.

Oct. 20, 1987.

M. Christie Helmer, Gregory A. Chaimov, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., John C. Cooper, III, C. Thomas Sylke, Whyte & Hirschboeck S.C., Milwaukee, Wis., for plaintiff.

Kenneth S. Klarquist, Ramon A. Klitzke, II, Klarquist, Sparkman, Campbell, Leigh & Whinston, Portland, Or., Franklin Brockway Gowdy, Rollin B. Chippey, Martin L.

Fineman, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

## OPINION

REDDEN, District Judge:

This action came on for trial on September 23, 1987, on the segregated issue of plaintiff's trademark rights in the product configuration of its helically shaped frozen french fried potato product (curlicue fries). The parties agreed to a bench trial for this phase of the litigation as only injunctive relief is sought.

I enter judgment for the defendant for the reasons set forth below. This Opinion shall serve in lieu of my findings of fact and conclusions of law. Fed.R.Civ.P. 52.

## FACTUAL BACKGROUND

### A. *Procedural*

This action was filed on September 29, 1986. Plaintiff and defendant are competitors in the frozen potato business. Plaintiff produces an allegedly distinctive, uniquely shaped, helical frozen potato product. Plaintiff contends that defendant planned to enter the market with an identically shaped frozen french fry product in violation of plaintiff's trademark rights.

Plaintiff filed a motion for preliminary injunction which was heard by Magistrate Dale on November 24, 1986. Magistrate Dale filed Findings and Recommendation on March 6, 1987, recommending that the preliminary injunction be granted. On May 26, 1987, I adopted the Findings and Recommendation of the Magistrate and the preliminary injunction issued on June 22, 1987. Defendant was enjoined from advertising, promoting, offering for sale, manufacturing or selling a helically shaped frozen french fry.

At a subsequent pretrial conference I determined that certain claims and defenses should be segregated for this trial which commenced September 23, 1987. The parties agreed that a determination of whether plaintiff had any protectable trademark rights in the product configuration of its frozen helically shaped french fry product could be dispositive on the balance of plaintiff's claims and would allow this case to be tried at the earliest opportunity.

At trial the parties litigated the second, third, and fifth claims for relief of the amended complaint relating to product configuration, and the affirmative defenses to those claims. The remainder of claims and counterclaims are reserved for later trial.

### B. *Substantive*

Plaintiff Universal Frozen Foods Co. (Universal) is a wholly owned subsidiary of Universal Foods Corporation, one of the nation's largest suppliers of food products. In 1985, Universal Foods Corporation purchased Idaho Frozen Foods and in 1986, it purchased Rogers Walla Walla (Rogers). Rogers and Idaho Frozen Foods were merged to form Universal Frozen Foods Co. Universal is in the business of selling frozen processed potato products to the institutional, food service and retail markets under various brand names and private labels.

Defendant Lamb–Weston is one of the nation's largest producers and sellers of frozen potato products. It sells a variety of frozen foods, predominantly frozen processed potato products, to the institutional, food service and retail markets. Lamb–Weston sells approximately 15% of its frozen potato products to private label organizations.

Universal seeks a permanent injunction to prevent Lamb–Weston from selling a frozen curlicue-shaped french fried potato product. Universal was the first to mass produce the frozen version of these helically shaped fries. It is uncontested that the helically shaped, or curlicue fries have been produced in a fresh cut version for many years, and that sales of the refrigerated product have frequently occurred.

Universal's predecessor, Rogers, experienced difficult financial times in the fiscal years beginning 1981 through 1983 and became known as a "second tier" producer of lower grades of commodity type frozen potato products. Rogers retained Robert Cowan to manage the company in 1983,

and he was largely responsible for the financial turn-around of the company.

Mr. Cowan foresaw the market potential for a frozen version of the helically shaped french fry which had been served to consumers for many years. He instructed Rogers' engineers to design and build a machine for producing the product and the machine was completed in 1983. The frozen helically shaped french fry was then marketed. The machine is the subject of a patent issued on February 24, 1987. It is undisputed that plaintiff, first as Rogers and now as Universal, has been the sole marketer, producer and supplier of the frozen helical fries since December 1983.

In fiscal year 1984, over 15 million pounds of helical fries were sold. This figure rose to 29 million pounds in fiscal year 1985 and 40 million pounds in fiscal year 1986. This product allowed plaintiff to enter the "tier one" market and increased the total number of plaintiff's active accounts six-fold in less than three years.

In 1981 and again in 1984, Lamb–Weston considered manufacturing a frozen curlicue fry but declined to do so. In late 1985, however, Lamb–Weston determined that there was a competitive need for it to produce curlicue fries. Defendant's engineers devised a means to economically produce the fries by adapting commercially available machinery which does not resemble plaintiff's process and does not infringe plaintiff's machine patent.

Lamb–Weston instructed its development team to produce a product that would equal or improve upon the characteristics of plaintiff's product. Lamb–Weston contends that it succeeded in developing a product with better texture, better color, less oil absorption, and an improved appearance. By late September 1986, Lamb–Weston claims it was ready, willing and able to enter the market with a competing frozen curlicue. It maintains that it had produced, packaged and shipped to a public warehouse approximately 50,000 pounds of product ready for sale. Defendant selected the name "Country Twist" for its product.

In August 1986, Robert Conroy, then president of Lamb–Weston, informed Mr. Cowan of defendant's intention to introduce frozen curlicue fries. Plaintiff wrote to defendant, asserted patent protection and trademark rights, and the lawsuit was filed soon thereafter. Defendant claims that the timing of the lawsuit was calculated to exclude defendant from the market at the time when annual purchase contracts are negotiated.

## DISCUSSION

### A. *Legal Standard*

■ To prevail on a claim for trademark infringement, plaintiff must prove that its helically shaped frozen french fry product is protectable as a trademark. In a case involving overall product configuration, a trade dress may be protected if it is nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir.1987); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir.1987).

### B. *Evidence at Trial*

#### 1. *Functionality*

■ The question before me is whether the product configuration of plaintiff's frozen helically shaped french fry product is nonfunctional. If it is, then it may be protectable.

The Ninth Circuit instructs that in determining functionality, a product's trade dress must be analyzed as a whole. *First Brands*, 809 F.2d at 1381; *Fuddruckers*, at 842–43. A product feature is functional if it is essential to the product's use or if it affects the cost and quality of the article. *Fuddruckers*, at 842.

The evidence makes it clear that the helical or curlicue shape of plaintiff's french fry product possesses utilitarian advantages. Mr. Cowan testified that he approved advertising which boasted its outstanding yield, low serving cost, terrific eye appeal, excellent flavor and texture and unique shape. Mr. Cowan attempted

to minimize this advertising as the result of overzealous marketing, but there is substantial evidence that he and other employees of plaintiff believe that the product does possess these advantages. Further, the evidence shows that these advantages do exist.

Defendant produced a fact sheet which touted the beneficial length of the curlicue fry due to its configuration. (Defendant's Exhibit 306). The document claims "four major benefits no other frozen french fry in America can match" including fresh appearance, superior yield, preferred flavor and self-advertising due to the curlicue's appearance. Another advertisement or information sheet produced by plaintiff depicts five different cuts of french fries in presumably single portion servings sitting on scales. (Defendant's Exhibit 216). The clear message of this advertisement is that the 1/4" cut and 1/3" cut curlicue fries fill the portion basket with fewer actual ounces of the product thus resulting in maximum profit. Again, this is attributable to the product's shape or configuration.

Mr. Cowan also testified that the shape of the product "possibly" results in more complete heat penetration in the cooking process. Evidence is that the product's enhanced flavor is due to the shape of the curlicue fries which permits more even cooking.

Richard Porter, plaintiff's Vice President of Sales and Marketing, testified that there are certain advantages that an operator realizes by using curlicue fries. He conceded that, in his opinion, some of these advantages are related to the shape. These include superior yield, better taste, better cosmetic plate coverage, slightly faster frying and service time and, possibly, a lower portion cost. As to this latter point, Mr. Porter testified that more recent analyses, prepared for this litigation, suggest the product may not result in a lower portion cost. Evidence shows that prior to the litigation, this witness as well as other plaintiff's employees, believed the product resulted in lower portion costs. Moreover, plaintiff's literature and advertising consistently touted a lower portion cost.

Evidence showed that the curlicue fry also produces manufacturing efficiencies because smaller potatoes can be used. Other premium priced french fries cannot be made from the smaller potatoes, and this creates a production advantage, another utilitarian advantage. Moreover, the smaller potatoes are less expensive to purchase.

Plaintiff does not dispute that the product configuration possesses some functional elements. Plaintiff concedes, for example, that the product has a good yield. However, plaintiff contends that this advantage cannot be viewed in a vacuum and that the relevant issue is whether the functional attributes provide an advantage to the customer. The evidence suggests that it does. The shape of this product configuration provides several advantages to the customer. These advantages include superior yield, lower portion cost, better cosmetic plate coverage, and advantages realized in the cooking process that result in improved flavor, faster service time and better heat penetration.

I conclude that the configuration of the curlicue fries affects the cost and quality of the product and renders it functional under the test of *Fuddruckers*. The functionality has been touted in plaintiff's advertising and such evidence is relevant on the issue. *In Re Morton–Norwich Products, Inc.*, 671 F.2d 1332 (Fed.Cir.1982). Further, the testimony revealed that plaintiff formerly viewed, and to some degree still views, its product as preferable due to its functional advantages.

The utilitarian considerations used in determining whether a product configuration is functional lead to the conclusion that this product configuration is functional and therefore not entitled to protection as a trademark. This conclusion is consistent with the underlying policy that functional shapes must be available to all competitors, that is, "[r]eproduction of a functional attribute is legitimate competitive activity." *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 863, 102 S.Ct. 2182, 2193, 72 L.Ed.2d 606 (1982) (White, J., concurring).

The defendant relies as well on the "aesthetic" functionality doctrine and contends that the product features of plaintiff's curlicue fries serve a functional purpose by making the product more aesthetically pleasing. *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir.1952). I need not explore this doctrine since I find the product is functional under other relevant tests. I also note that "[i]n this Circuit, the 'aesthetic' functionality test has been limited, if not rejected." *First Brands*, 809 F.2d at 1382 n. 3 (9th Cir.1987).

I find that the product configuration of the curlicue fries is functional and need not determine whether the product has acquired secondary meaning or whether imitation of it creates a likelihood of confusion. However, these issues were fully litigated and I have reached an opinion on them. In the event an appellate court concludes my finding of functionality is incorrect, these further findings may be considered and result in a substantial savings to the parties in costs of future litigation.

### 2. *Secondary Meaning*

If a trade dress is determined to be nonfunctional, it must also be inherently distinctive or have acquired secondary meaning to qualify for trademark protection. The trade dress of a product attains secondary meaning when the purchasing public associates the dress with a particular source. *Fuddruckers*, at 843; *First Brands*, 809 F.2d at 1383.

Plaintiff does not argue that its product configuration in the curlicue fries is inherently distinctive. It must show, then, that the product has acquired secondary meaning during the time in which it has been used in interstate commerce. *Fuddruckers* teaches that evidence of deliberate copying is relevant to a determination of secondary meaning and, in appropriate circumstances, may suffice to support an inference of secondary meaning. *Fuddruckers*, at 845. There was evidence that the defendant decided to copy plaintiff's product, both in its shape and the phonetic name to identify the product. Defendant's witnesses testified, however, that they also sought to improve the product. Moreover, the product shape is not original to plaintiff. Both parties sought to copy a product shape that has been on the market, in the fresh cut version, for years. The evidence of copying is insufficient to support an inference of secondary meaning.

The parties disagree at which buyer level secondary meaning must exist. Plaintiff concedes that its product has not acquired secondary meaning at the consumer level since the consuming patrons do not know the source of the product. In fact, producers of such products hope that patrons conclude that what is served is fresh cut. Plaintiff asserts that the appropriate buyer level is that of the distributors. It cites *Centaur Communications v. A/S/M Communications*, 652 F.Supp. 1105, 1109 (S.D.N.Y.1987) for the proposition that in determining the existence of secondary meaning, "[t]he question is not whether the general public, but the relevant buyer class associates a name with a product or source." (Citations omitted). That case found the "relevant buyer class" to be consumers likely to purchase the magazines which formed the basis of that lawsuit. *Id.* Here, plaintiff contends the "relevant buyer class" is the distributors to whom plaintiff directly sells its product.

It is defendant's position that the consumer level is where secondary meaning must be established. Defendant's expert witness, Professor J. Thomas McCarthy, testified that in his opinion it is consumer perception that is relevant to prove secondary meaning, and not the perception of professional distributors. Professor McCarthy testified that the demand for these food products is derived from the ultimate consumer and that the perception of the distributors, gleaned through surveys is not probative of consumer perception.

This issue is not clearly answered in this Circuit. I am persuaded that under some circumstances the relevant buyer class may be other than the ultimate consumers. I proceed on that premise to determine if plaintiff's product has achieved secondary

meaning at the distributor or operator (restaurant) level.

Plaintiff has failed to demonstrate secondary meaning at the distributor level. First, the evidence established that curlicue french fries in the fresh cut and refrigerated version, have been sold for many years. Plaintiff has not established that buyers associate all curlicue fries exclusively with it as a source.

Second, plaintiff's expenditures for advertising do not establish secondary meaning. The evidence shows that the advertising did not contribute to creating brand awareness. The advertising promotes the utilitarian, functional and decorative features of the product without causing the viewer to associate the trade dress with a particular source. *First Brands*, 809 F.2d at 1383.

Third, the 34 form statements, which were signed by wholesale distributors, and introduced by plaintiff, do not establish secondary meaning. At the preliminary injunction hearing the plaintiff offered these unsworn statements which were then admitted as evidence of secondary meaning as of September 1986. This was at a time prior to any alleged "contamination" of the distributor market. The forms are identical form statements which were offered to plaintiff's distributors for signature at the request of plaintiff's sales force. In his testimony, Professor McCarthy referred to his treatise which states "As to questionnaires, their mode of submission to customers must be very carefully controlled so that responses will be totally free and not colored by the customers' knowledge of what is wanted." McCarthy, Trademarks and Unfair Competition at § 15:24 C. Mr. Porter testified that customers were told that all that they were saying was that, at the time of the questionnaire, their only source of supply was the plaintiff. I agree that these statements have little or no probative value on the issue of secondary meaning at the distributor level.

Fourth, defendant's expert Robert C. Sorensen testified persuasively as to the inadequacies of plaintiff's survey evidence. Dr. Sorensen's concerns with plaintiff's survey evidence focused primarily on the definition of the universe, the nature and size of the sample, and the contents of the questions employed by plaintiff's expert in conducting its survey. Without recounting this testimony at length, I note that Dr. Sorensen found the "universe" of plaintiff's survey to improperly exclude those restaurant operators serving the fresh cut version of the curlicue fries; the sample size of 30 distributors to be too small and possibly unstable; the questioning skewed in its emphasis on frozen potatoes early in the interview; the absence of alternative response choices to be problematic; and finally, the emphasis on "one company" or "more than one company" as inappropriate in a secondary meaning study. I found Dr. Sorensen's criticisms of plaintiff's survey well founded. The survey does not establish secondary meaning in the shape of the curlicue product.

Plaintiff has failed to establish the existence of secondary meaning at the distributor or operator level such that those buyers associate the product configuration of the curlicue fries with plaintiff as the particular source.

### 3. *Likelihood of Confusion*

█ Assuming arguendo that plaintiff had shown its product configuration to be nonfunctional and to have acquired secondary meaning, plaintiff would still be required to prove that imitation of its curlicue fries is likely to cause confusion. Likelihood of confusion "exists when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fuddruckers*, at 845 (citations omitted).

Preliminarily, I note that Professor McCarthy's testimony is persuasive that proof of secondary meaning is a condition precedent to any discussion of likely confusion. He testified that, to be confused, the customer must have some "brand" in mind that he or she is looking for, and buys the junior user's product under the confused impression that it is a product of the senior

user. It follows that a buyer cannot be "confused" where, as here, he or she does not recognize the product shape as a symbol of origin.

Putting that notion aside, however, I review the evidence on this issue. The factual elements that make up likelihood of confusion include evidence of actual confusion, the defendant's intent in adopting the mark, similarity of marks, similarity of goods and marketing channels, and the strength of the mark. *Fuddruckers*, at 845–46.

I find that the distributors and operators in this instance are not likely to be confused by the shape of plaintiff's curlicue fries and will know the identity of the company from which they purchase the product. The distributors order the product from the company and the product is packaged in a box with the company's name identifying the source. The survey evidence fails to support a finding of actual confusion and I have already noted that the evidence is insufficient to prove that the defendant intended to adopt the mark. Rather, it intended to improve the product. While the marks and the marketing channels are similar, the strength of the mark is not established by the evidence. The curlicue fries have been on the market for many years in a fresh and refrigerated version and the product shape is associated with no particular manufacturer.

I find that plaintiff has failed to establish that imitation of its product configuration is likely to confuse purchasers. Plaintiff has conceded that food distributors are sophisticated in their purchasing habits and I find that they are not likely to be confused as to source by the shape of the product.

#### 4. *Issues Not Decided*

I decline to rule on the effect, if any, of plaintiff's pending application for trademark registration. On January 20, 1987, the Patent and Trademark Office advised plaintiff that registration was being refused because the design sought to be registered appears to be a configuration primarily functional in nature. A Letter of Protest was made part of the application file and the proceedings before that office have been suspended pending this litigation.

Defendant urges the application to this case of the "Shredded Wheat" case, *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). *Kellogg* held that the shredded wheat biscuit shape, produced by a patented manufacturing process, passed into the public domain when the patent on the machine expired. Professor McCarthy testified that the utility patent on a machine is the sole source of exclusive rights on the products of a machine under the *Kellogg* holding, either during the 17 year patent term or after its expiration.

Plaintiff holds utility patent No. 4,644,838 which relates to method and apparatus for cutting potatoes into "helical strips." Defendant contends that under *Kellogg*, plaintiff's exclusive rights over the potato machinery and product are limited to the rights granted in the patent and that plaintiff cannot acquire any trademark rights in this shape.

Plaintiff contends that other shapes may be produced on its patented machinery thereby avoiding the holding of *Kellogg*. However, *Kellogg* does not suggest that the product at issue must be the only shape that the patented machine can produce. Further, other patents exist on other machinery designed to produce curlicue fries.

I find it unnecessary to decide whether *Kellogg* controls here, or whether the various patents introduced at trial have any effect on plaintiff's asserted trademark rights.

### CONCLUSION

For the reasons discussed above, I find that plaintiff has failed to meet its burden of proof on the trademark issues presented. I find that the product configuration of plaintiff's frozen curlicue shaped french fry is functional and not entitled to trademark protection. Further, it has not acquired secondary meaning. I do not find that imitation of the product configuration

is likely to cause confusion at any point in the distribution chain.

Because trademarks are of potentially infinite duration, recognition of trademark rights in the curlicue shape would have the effect of creating a monopoly to plaintiff. The policy of public domain is that functional shapes must be available to all competitors in a free enterprise system of economic competition.

The preliminary injunction is dissolved and I deny plaintiff's motion for a permanent injunction.