**LAMB–WESTON, INC., Plaintiff,**

v.

**McCAIN FOODS, INC. and McCain Foods Ltd., Defendants.**

No. CY–90–3082–AAM.

United States District Court, E.D. Washington.

Jan. 25, 1993.

Robert E. Rohde, Bogle & Gates, Seattle, WA, for plaintiff.

Dennis P. Hession, Richter Wimberley Ericson Woods Brown, Spokane, WA, Michael R. Levinson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant.

## MEMORANDUM OF DECISION

McDONALD, District Judge.

This is a civil action for patent infringement, trademark infringement, unfair competition, and trademark dilution with respect to an allegedly unique lattice-shaped potato product. The defendants counterclaimed for a declaratory judgment of patent invalidity and unenforceability and for damages under the antitrust laws. A bench trial was conducted on the patent and trademark issues in September 1992, before the Honorable Alan A. McDonald, at Yakima, Washington.[1] Robert E. Rohde, Ramsey Al–Salam, and Al Van Kampen of BOGLE & GATES appeared on behalf of the plaintiff. Alan L. Unikel, Michael Levinson, and Alex Vessilinovitch of SEYFARTH, SHAW, FAIRWEATHER & GERALDSON and Dennis Hession of RICHTER–WIMBERLEY, P.S. represented the defendants.

After full consideration of the evidence and the arguments of counsel, the court enters the following Memorandum of Decision which shall constitute the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

---

1. By order dated December 23, 1991, the court granted the plaintiff's motion for a separate trial of the antitrust claims (Ct.Rec. 113).

## I.

Lamb–Weston, Inc. (Lamb–Weston) is a Delaware Corporation with its principal place of business at Kennewick, Washington. Lamb–Weston is a food processing company primarily engaged in the business of processing and distributing frozen potato products. It has processing plants located in Oregon, Washington and Idaho.

The defendants are food processors that compete with Lamb–Weston in the frozen potato business. Defendant McCain Foods, Ltd. is incorporated under the Laws of Canada and has its principal place of business in Florenceville, New Brunswick, Canada. Defendant McCain Foods, Inc. is a Maine corporation with its principal place of business at Easton, Maine.[2] The latter is a subsidiary of McCain U.S.A., Inc., the United States subsidiary of McCain Foods, Ltd. McCain's largest food processing facility is located in Othello, Washington.

The parties do not dispute jurisdiction or venue. Jurisdiction over this matter exists by virtue of 28 U.S.C. § 1338; 35 U.S.C. § 281, and 15 U.S.C. § 1121. Venue is proper in this district under 28 U.S.C. §§ 1391(c), 1400(b).

## II.

Lamb–Weston and McCain make and sell a wide variety of frozen potato products, including french fries of diverse configurations and dimensions, diced potatoes, wedges, hashbrowns, tater tots, and other specialty items. Their products are sold to food service customers (restaurants, fast-food chains, hospitals, schools and other institutions) and to retail customers (grocery stores). Ninety-eight percent of Lamb–Weston's frozen potato products are sold to food service customers[3] and the remaining two percent are sold to retail customers. McCain's sales in the United States are equally divided between the food service market and the retail market.

Most of the potato products produced by Lamb–Weston and McCain are partially fried ("parfried") and frozen prior to distribution. Frozen, parfried potato products are extremely popular in both the food service and retail markets because the parfry process reduces the time and effort necessary to prepare the product for ultimate consumption. The food service worker or retail customer need only complete the cooking process by deep fat frying, baking or microwaving the product.

Due to the fierce competition in the frozen potato market, major food processors like Lamb–Weston and McCain must constantly strive to develop new products and improve existing ones. This litigation centers around the development of a frozen, parfried lattice-shaped french fry most commonly referred to as a "waffle fry."

On October 26, 1979, an independent inventor named Edgar M. Matsler wrote to Gary Blakely, Lamb–Weston's Director of New Product Lines, informing Blakely that he had developed a method and apparatus for slicing potatoes. Matsler claimed that the "apparatus produces, in volume, a unique Potato slice that should have a significant impact on the pre-sliced, frozen fry markets, both commercial and retail." [4] (Exhibit 604). Matsler offered to disclose his apparatus to Lamb–Weston if the latter would agree to keep the information confidential and not use it without Matsler's permission.

On December 6, 1979, Blakely sent a letter to Matsler expressing Lamb–Weston's interest in the cutting device. The letter contained a disclosure agreement and urged Matsler to call for an appointment to discuss his concept. (Exhibit 607). Matsler signed and returned the disclosure agreement with a cover letter providing more information about his device. Matsler boasted that his "product" had eye appeal, possible reduction of frying time, and taste appeal. He referred to it as the "best of chip & fry." (Exhibit 608).

---

**2.** Unless otherwise stated, the defendants shall be hereinafter referred to collectively as "McCain."

**3.** Lamb–Weston is a major supplier for fast-food chains such as McDonald's, Burger King, and Chick-Filet.

**4.** Matsler sent similar letters to other major food processors such as Ore–Ida, J.R. Simplot, and Gourmet Foods. (Exhibits 605, 709, 605).

On January 25, 1980, Matsler brought his potato-slicing device to Lamb–Weston's research and development facility in Tigard, Oregon, for a demonstration. While Matsler discussed his cutting concept with Blakely, other Lamb–Weston employees performed a test run of the cutting machine. The potato slices produced during the demonstration were subjected to three conventional processing techniques. The first technique employed was a basic blanching process often used for hashbrowns. The slices were blanched for two minutes at 180 degrees Fahrenheit and then frozen. The second method was a basic parfry process, consisting of a two-minute blanch at 180 degrees, a 30-second parfry at 365 degrees, and subsequent freezing. The third method was a microwave or microfry process, wherein the slices were blanched for two minutes at 170 degrees, parfried for two and a half minutes at 365 degrees, and then frozen.

Immediately after the demonstration, Blakely held a brief meeting with Jerry Sloan, Richard Livermore,[5] and Darrell Covert[6] to discuss Matsler's apparatus. They agreed the apparatus could be adapted for commercial purposes and concluded that the overall concept was sufficiently interesting to pursue. Before Matsler left the Tigard facility, the parties executed a confidentiality agreement. (Exhibit 612). Shortly thereafter, Lamb–Weston began negotiations with Matsler's patent attorney for a licensing agreement to use the Matsler concept and device. (Exhibit 613).

On February 6, 1980, Lamb–Weston received a letter from Murray Jayne, another independent inventor who claimed to have a machine for cutting lattice-shaped french fries. (Exhibit 788). The letter claimed that "[b]ecause of the open lattice design, the potato fries more evenly and more crisply than the typical cut." Attached to Jayne's letter was a picture depicting a cutting machine and several lattice-shaped potato slices purportedly produced by the machine. On February 11, 1980, Jerry Sloan forwarded Jayne's letter to Gary Blakely with a note expressing interest in the machine and suggesting that a demonstration be arranged.

On February 22, 1980, Matsler accepted an offer from the J.R. Simplot Company, one of Lamb–Weston's competitors who was also interested in pursuing Matsler's cutting concept. On this same date, Matsler terminated negotiations with Lamb–Weston. (Exhibit 614).

Sometime in February 1980, Murray Jayne shipped his cutting machine to Lamb–Weston at the latter's request. The device, which was a crude prototype, was evaluated by Lamb–Weston employees during March of 1980. Lamb–Weston engineers initially believed the Jayne device could be adapted for commercial production, but subsequent evaluations revealed that extensive modification would be required before it would be commercially acceptable. Negotiations with Jayne were terminated in mid–1980 when Lamb–Weston decided to develop its own prototype, the "Moonwalker."

Test markets were conducted on the waffle-fry product as early as June 1980, but by early 1982, Lamb–Weston still had not developed a cutting device adequate for commercial production. Lamb–Weston abandoned work on the Moonwalker in late 1981 or early 1982 because it was incapable of producing at commercially acceptable levels. Lee Wheeler[7] suggested that the company investigate alternative designs for a cutting device and recommended the acquisition and modification of an Urschel Model CCL which was designed to cut lattice-style potato chips.

In an effort to facilitate the development of the cutter, Lamb–Weston attempted to persuade the engineers at Urschel to make the necessary modifications since they were more experienced in equipment fabrication and manufacturing. Urschel declined to modify the device for Lamb–Weston but

---

**5.** Richard Livermore worked in Lamb–Weston's Engineering Department and was responsible for equipment development and improvement.

**6.** Darrell Covert was one of the individuals involved in the development of a commercially acceptable cutting device for waffle-shaped fries. He supervised the work of Richard Livermore.

**7.** Lee Wheeler was in charge of process development and was responsible for evaluating equipment designs. Wheeler supervised the work of John Julian and his predecessor Mike Carrow.

granted Lamb–Weston permission to make the modification.

John Julian joined the research group in the summer of 1981, replacing Mike Carrow as the project leader for the development of a waffle-shaped cutting device. Julian was assigned the task of modifying the blade assembly of the Urschel Cutter. A satisfactory knife assembly was not developed until late 1982, and a viable commercial cutting machine was finally achieved in the summer of 1983. The first test run of the machine was conducted in February of 1983. Commercial production began in November or December of 1983.

An acceptable waffle-fry product was achieved by late summer 1980, but due to the protracted development of the cutting device, Lamb–Weston continued to experiment with different thicknesses and various processing methods. Numerous combinations of blanching, drying, frying, and double frying were tried, utilizing various temperatures and time frames. At one point, the marketing group grew so frustrated with the delay in developing an adequate cutting device that it considered abandoning the waffle-fry project altogether.

Lamb–Weston began selling its frozen, par-fried waffle fry under the brand name "CrissCut" in 1983. Lamb–Weston registered the name "CrissCut" as its trademark for waffle fries, but the registration is limited solely to the name. Lamb–Weston has no other registered trademark relating to waffle fries.

On August 22, 1983, John Julian applied for a United States patent on the "waffle-cut potato product and apparatus and process for making same." In the application, Julian claimed to be the inventor of three separate inventions: a waffle-shaped potato product, an apparatus for cutting the waffle-shaped product, and the process for making the product. Jerry Sloan and Lee Wheeler were subsequently identified to the Patent and Trademark Office (PTO) as being joint inventors of the claimed inventions. The patent application was given Serial No. 06/525,115

("the '115 Application"). The inventors assigned all right, title and interest in the application to Lamb–Weston.[8]

The '115 Application was initially rejected by the PTO because it encompassed more than one invention, in violation of PTO rules. Lamb–Weston elected to separate the process and product claims from the '115 Application and to proceed solely on the claims directed to the cutting apparatus. On June 18, 1985, the PTO issued United States Patent No. 4,523,503 ("the '503 Patent") for the modified Urschel Cutter. The '503 Patent is not at issue in this litigation.

In December 1984, while the '115 Application was still pending before the PTO, the inventors filed a divisional application, seeking protection for the waffle-cut product that had been separated from the '115 Application. The divisional application was assigned Serial No. 06/682,366 ("the '366 Application"). The product claimed in the divisional application was a frozen, parfried waffle fry with specific dimensions and characteristics. The '366 Application was essentially identical to the '115 Application except the process claims were eliminated and some minor changes were made to clarify that the '366 Application was a divisional application.[9]

The Patent Examiner initially rejected the claims of the '366 Application as unpatentable over a series of references, many of which were cited on the face of the patent. The Examiner found, pursuant to 35 U.S.C. § 103, that the claimed invention would have been obvious to one of ordinary skill in the art based on the prior art references. The applicants responded by amending the application and asking for reconsideration, emphasizing that the prior art was limited to thin, waffle-cut potato chips of no greater than ⅛″ thickness. The applicants urged the Examiner to consider secondary factors of nonobviousness such as commercial success and copying by competitors. On January 23, 1986, the Examiner issued his final rejection.

The applicants filed an appeal from the examiner's final rejection in the Patent Office

---

8. The '115 Application was prepared by Lamb–Weston's patent counsel, Ramon Klitzke II of Klarquist, Sparkman, Campbell, Leigh & Whinston (the "Klarquist law firm").

9. The inventors abandoned their pursuit for a patent on the process for making the potato product.

Board of Appeals and Interferences. In January 1990, the Board reversed the Examiner's rejection and ordered a patent to issue. On June 26 1990, the United States Patent Office issued U.S. Patent No. 4,937,084 ("the '084 Patent") for the waffle-cut potato product.

In 1985, McCain Foods, Inc. began making and selling frozen, par-fried, waffle fries in the United States under the brand name "SuperChip." The Superchip is substantially identical in dimension and appearance to Lamb–Weston's CrissCut fry. Like the CrissCut, the Superchip is sold in a frozen state to restaurants where it is finish-fried to produce an edible french fry.

On September 28, 1990, Lamb–Weston filed a complaint for patent infringement, alleging that McCain Foods, Inc., with actual and constructive notice of Lamb–Weston's rights in the '084 Patent, willfully and actively infringed the same by selling potato products covered by the claims of the '084 Patent. Lamb–Weston filed an amended complaint on March 4, 1991, adding McCain Foods, Ltd. as a defendant. A second amended complaint was filed on December 16, 1991, adding trademark and unfair competition claims.

McCain denies committing any acts of infringement or unfair competition and seeks a declaratory judgment that claims 1 through 4 of the '084 Patent are invalid and unenforceable. Specifically, McCain alleges that the claims would have been obvious to one skilled in the art at the time the alleged invention was made; the claims fail to satisfy the enablement and definiteness requirements of 35 U.S.C. § 112; the inventors did not themselves invent the subject matter of the claimed invention; and the inventors and their patent counsel committed inequitable conduct during the prosecution of the patent application.

### III.

The '084 Patent sets forth four claims relating to a waffle-cut potato product:

1. A parfried potato product, suitable for reconstitution by cooking, comprising: a frozen, sliced potato section having a substantially ellipsoidal shape and a variable thickness, including a peak to peak thickness within the range of about ⁹⁄₁₆ to ¹⁰⁄₁₆ inch;

the section including opposed first and second sides, each side having longitudinal ridges and grooves therebetween, the ridges and grooves of the first side extending angularly to the ridges and grooves of the second side;

the grooves of the first and second sides having a depth sufficient to intersect one another to form a grid of openings in the potato section;

the section, before reconstitution, having an oil content of about 6–20%, by weight, and a solids content of about 32–40%, by weight;

whereby the product, upon reconstitution by cooking, is characterized by very thin, crisp portions of locally increased oil flavor adjacent the openings, relatively thick portions defined by intersecting ridges having an internal mealy texture and strong potato flavor similar to thick-cut french fried potato strips, and portions of intermediate thickness whose characteristics are similar to french fried show string potato strips.

2. The product of claim 1 wherein the section has an oil content of about 16–20%, by weight, and a solids content of about 55–65%, by weight, after oil fry reconstitution at a temperature within the range of about 350 F. to 360 F. for about 135–165 seconds.

3. The product of claim 1 wherein the section has an oil content of about 16–20%, by weight, and a solids content of about 55–65%, by weight, after reconstitution, whereby the thickest portions of the product have characteristics akin to thick-cut french fried potato strips, the thinnest portions have characteristics akin to potato chips and other portions have characteristics akin to french fried show string potato strips.

4. The product of claim 1 wherein the peak-to-peak thickness is about ⁷⁄₁₆.

(Exhibit 1). The specifications of the '084 Patent state that the object of the invention is to provide a potato product that is suitable for processing as a deep-fried potato product and has the unique taste and texture charac-

teristics of french-fried shoe string potatoes, steak-cut french fries and potato chips. While the specifications describe a sample method for cutting and preparing the potato product, the actual claims are limited to a frozen, parfried waffle-cut potato product possessing specific dimensions and characteristics and do not include the cutting apparatus or the process for preparing the product.

## A. INFRINGEMENT

■■■ A party alleging infringement has the burden of proving infringement by a preponderance of the evidence. *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 5 U.S.P.Q.2d 1434 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1282, 230 U.S.P.Q. 45, 45 (Fed.Cir.1986). There are two tests for determining whether an accused device infringes a patented invention: the Literal Infringement Test and the Doctrine of Equivalents. Under the literal infringement test, the court interprets the scope of the claims in the patent and compares the interpreted claims to the infringing product. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578, 6 U.S.P.Q.2d 1557, 1559 (Fed.Cir.1988); *Trilogy Communications, Inc. v. Comm Scope Co.,* 754 F.Supp. 468, 503, 18 U.S.P.Q.2d 1177 (W.D.N.C.1990). This test focuses on the individual elements of the claims asserted in the patent rather than the invention as a whole. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 933–34, 4 U.S.P.Q.2d 1737, 1739–40 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988); *Trilogy Communications,* 754 F.Supp. at 503. The claims are construed in light of the specification set forth in the patent and the prosecution history. *Grain Processing Corp. v. American Maize–Products, Co.,* 840 F.2d 902, 908, 5 U.S.P.Q.2d 1788 (Fed.Cir.1988); *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 19 U.S.P.Q.2d 1500 (Fed.Cir.1991). "Where all claim limitations are present in the accused device exactly, the claims 'read on' the accused device and literal infringement is made out." *Jurgens v. McKasy,* 927 F.2d 1552, 1560, 18 U.S.P.Q.2d 1031 (Fed.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991); *ZMI Corp.,* 844 F.2d at 1578.

■■ When literal infringement cannot be found, the doctrine of equivalents comes into play. *Uniroyal,* 837 F.2d at 1057. Under the doctrine of equivalents, patent infringement may be found if the accused device performs substantially the same overall function in substantially the same way to obtain the same overall result as the claimed invention. *Graver Tank and Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 330 (1950); *ZMI Corp.,* 844 F.2d at 1581; *Uniroyal,* 837 F.2d at 1057; *Pennwalt Corp.,* 833 F.2d at 934, 4 U.S.P.Q.2d at 1739.

■■ Lamb–Weston conducted several comparison tests between its CrissCut and the McCain SuperChip in March 1986, August 1986, December 1988, March 1989, and September 1992. The March 1986 test showed that upon reconstitution by oven baking, the McCain retail product had a solids content of 44.48 percent and an average oil content of 9.11 percent. The August 1986 test showed that the McCain foodservice product had a solids content in the parfried state of 31.83 percent and an oil content of 5.35 percent. The solids and oil contents after reconstitution by finish frying were 54.52 and 18.60 percent respectively. (Exhibits 99, 830).

The test conducted in December 1988 showed the McCain SuperChip having a 38.94 percent solids content and 8.79 percent oil content in the parfried state. The finish fried product had a solids content of 63.21 percent and an oil content of 19.24 percent. (Exhibit 154).

The March 1989 analysis of the SuperChip indicates an average parfry solids content of 38.2 percent, with a range of 37.38 to 39.34 percent, and an average parfry oil content of 9.25 percent, with a range of 8.24 to 10.17 percent. The average refry solids content measured 62.47 percent, with a range of 61.59 to 63.49; and the average refry oil content measured 21.89 percent, with a range of 20.89 to 23.43. (Exhibit 153).

The results of the September 1992 analysis show a parfry average solids content of 34.75 percent and an average oil content of 8.83 percent. The average refry solids content

was 53.36 percent and the oils content was 16.46 percent. (Exhibit 233).

The test results, considered as a whole, establish that the solids and oil contents of the SuperChip fall well within the ranges set forth in the claims of the '084 Patent. The tests further reveal that the McCain Super-Chip is a frozen, parfried potato product suitable for reconstitution by cooking and is identical in appearance to the CrissCut. The SuperChip is ellipsoidal in shape with a variable thickness, including a peak to peak thickness measuring between ⁵⁄₁₆ and ⁷⁄₁₆ inch. It has longitudinal ridges and grooves, with the ridges and grooves on one side extending angularly to the ridges and grooves on the opposite side. The grooves on each side have a depth sufficient to intersect one another, thereby forming a grid of openings in the potato slice.

The SuperChip, upon reconstitution by cooking, has very thin, crisp portions adjacent to the openings and relatively thick portions where the ridges intersect. The thick portions have a mealy texture and strong potato flavor similar to thick-cut french fries, the portions of intermediate thickness have flavor and texture characteristics similar to french fried shoe string potato strips, and the thin portions, and the thinnest portions have characteristics akin to potato chips.

Lamb–Weston has established by a preponderance of the evidence that every claim limitation in the '084 Patent is present in the McCain SuperChip. Based on this evidence, the court finds that the defendants' sale of the SuperChip fry in the United States subsequent to the issuance of the '084 Patent on June 26, 1990, constitutes an infringement of Lamb–Weston's patent rights under 35 U.S.C. § 281. This finding of infringement does not end the inquiry, as the court must now determine whether the claims of the '084 Patent are valid and enforceable.

## B. VALIDITY

▮ The patentability of an invention is dependent upon three essential conditions: utility, novelty,[10] and nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 12, 86 S.Ct. 684, 691, 15 L.Ed.2d 545 (1966); *Sun Products Group, Inc. v. B & E Sales Co., Inc.*, 700 F.Supp. 366, 375, 9 U.S.P.Q.2d 2009 (E.D.Mich.1988). Once a patent is issued by the PTO, it carries a presumption of validity. 35 U.S.C. § 282. The burden of establishing the invalidity of a patent, or the invalidity of any claim thereof, rests on the party asserting such invalidity. 35 U.S.C. § 282. The presumption of validity may be rebutted only by clear and convincing evidence. *Greenwood v. Hattori Seiko Co., Ltd.*, 900 F.2d 238, 241, 14 U.S.P.Q.2d 1474 (Fed.Cir.1990); *Uniroyal v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.1990).

▮ Clear, cogent and convincing evidence denotes a quantum of proof greater than a mere preponderance of the evidence, although it does not require proof beyond a reasonable doubt. It has been referred to as evidence that is plain and convincing beyond reasonable controversy. 13 S. Williston, a Treatise on Law of Contracts, § 1597. Substantial evidence, which by itself is sufficient to satisfy the clear, cogent and convincing standard, is not made any less substantial by the presence of contradictory testimony which the trial court may have disregarded as not being credible. *Vermette v. Andersen*, 16 Wash.App. 466, 558 P.2d 258 (1976).

Like other matters subjective in nature, it is more easily recognized than defined; often better tested by the visceral than the cerebral. Findings that follow come from a de-

---

**10.** The utility and novelty requirements derive from Section 101 which requires that a patentable invention be "new and useful." 35 U.S.C. § 101. The meaning of "new" is defined in Section 102 which lists numerous situations that will negate novelty and thereby preclude patentability. For example, Section 102(a) precludes patentability if the invention "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." Section 102(e) precludes patentability if the invention "was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent...." Section 102(g) precludes patentability if "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it."

tailed record, observation of the witnesses, and an assessment of veracity and are considered by this court to be compelling.

### 1. *Anticipation under § 102.*

■ If a prior art reference discloses every element of a claimed invention, either expressly or by necessary implication, it is said to "anticipate" the claimed invention. *Trilogy Communications, Inc. v. Comm Scope Co.*, 754 F.Supp. 468, 506 (W.D.N.C. 1990) (citing *In re Donohue*, 766 F.2d 531, 534, 226 U.S.P.Q. 619, 621 (Fed.Cir.1985)). A finding of anticipation negates novelty and renders a patent invalid under 35 U.S.C. § 102. The standard for anticipation is one of strict identity: it will be found only if **all** essential elements of the claimed invention are disclosed in a **single** prior art reference. 35 U.S.C. § 102; *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1554, 220 U.S.P.Q. 303, 313 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Lamb–Weston addressed the issue of anticipation in its trial brief and again at trial, urging the court to find that no single prior art reference discloses all elements of the '084 Patent. While the record supports Lamb–Weston's position, the court notes that the defendants did not specifically allege the defense of anticipation in their answer or attempt to establish the same at trial. Indeed, counsel for the defendants explained that any evidence pertaining to Section 102 of the Act was admitted solely for the purpose of establishing obviousness or joint inventorship, not anticipation. Because the issue of anticipation is not properly before the court, no findings shall be made relating thereto.

### 2. *Obviousness.*

■ The nonobviousness requirement stems from 35 U.S.C. § 103, which in pertinent part provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The issue of obviousness under § 103 is a question of law based on underlying factual determinations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *In re Vaeck*, 947 F.2d 488, 493, 20 U.S.P.Q.2d 1438 (Fed.Cir.1991). Before assessing the ultimate legal question of obviousness, the court must make factual determinations regarding: (1) the level of ordinary skill in the pertinent art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claims at issue, and (4) objective evidence of nonobviousness, such as commercial success, long felt but unsolved needs, failure of others to create the invention, copying, and unexpected results. *Graham*, 383 U.S. at 17–18, 86 S.Ct. at 694; *Greenwood*, 900 F.2d at 241; *Sun Products Group, Inc.*, 700 F.Supp. at 375.

■ Obviousness must be tested as of the time the invention was made and in the state of the art that existed at that time. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 5 U.S.P.Q.2d 1434 (Fed.Cir.1988); *Trilogy Communications*, 754 F.Supp. at 507. The court cannot rely on hindsight or use the patent as a guide in evaluating the prior art. *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 625 F.Supp. 343, 348 (E.D.Mich.1985), *aff'd*, 800 F.2d 1101, 231 U.S.P.Q. 185 (Fed. Cir.1986).

#### a. *Level of Ordinary Skill in the Art.*

The hypothetical person of ordinary skill is presumed to know all of the teachings known in the art at the time the alleged invention was made and is "pictured as working in his shop with the prior art hanging on the walls around him." *Trilogy Communications*, 754 F.Supp. at 507 (citing *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1576, 220 U.S.P.Q. 584, 591 (Fed.Cir.1984)).

[A] fundamental tenet of the law of prior art and obviousness is that the inventor-patentee stands in the shoes of the mythical person with ordinary skill in the art and is presumed to be "fully informed of everything which preceded him, whether such were the actual fact or not."

2 D. Chisum, Patents § 5.03[3] (1992) (quoting *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 493–94, 20 S.Ct. 708, 712, 44 L.Ed. 856 (1900)).

■■■ Several factors may be considered in determining the level of ordinary skill in the art. These include: "(a) the type of problems that tend to be encountered in art in question, (b) solutions which the prior art developed for those problems, (c) the rapidity with which innovations are made in the art, (d) the relative sophistication of the technology, and (e) the prevailing educational level of active workers in the field." *Sun Products Group, Inc.*, 700 F.Supp. at 377. Evidence of contemporaneous invention is also probative of the level of knowledge in the art at the time the invention was made. *In re Merck & Co.*, 800 F.2d 1091, 1098 (Fed.Cir.1986).

The court deems it appropriate to begin its search for the person of ordinary skill in the art with an examination of the skills possessed by those who were actually assigned the task of developing the waffle-cut product. Inventor Jerry Sloan has a Bachelor of Science Degree and a Master's Degree in food science and technology.[11] Prior to inventing the CrissCut, Sloan had acquired at least ten years of experience in new product development, equipment development and improvement, and technical problem-solving.

Inventor John Julian has a Bachelor of Science Degree in Microbiology. At the time of the invention, he was a process systems designer, responsible for the design and development of equipment, processes, and products. Prior to becoming a process systems designer, Julian had six years of experience as a production supervisor and was responsible for overseeing the operation of the entire plant during a given shift. Inventor Lee Wheeler has a Bachelor of Science Degree in chemical engineering and had acquired at least five years of experience in product and process engineering prior to working on the waffle-fry invention. Wheeler supervised the work of Julian and others who worked on the development of the waffle-fry and cutting apparatus.

The level of education and experience possessed by Sloan, Wheeler, and Julian closely parallels that of the J.R. Simplot employees who were involved in the evaluation and modification of Matsler's cutting apparatus during the Spring of 1980 and comports with the definition of ordinary skill given by McCain's expert, Mr. Merle L. Weaver. According to Mr. Weaver, a person with ordinary skill in the art would have a college education or some technical training, but not necessarily so, and at least five years of experience in the potato processing business. He or she would be in a position with decision-making authority regarding new product development and would be familiar with the basic food processing methods commonly used to prepare frozen potato products.

Mr. Weaver's definition accurately portrays a person of ordinary skill in the art at the time of the invention and will be adopted by the court for the purpose of determining the obviousness issue.

b. *Scope and Content of Prior Art.*

■■■ Section 103 does not expressly define "prior art," but it does suggest that § 102 is to serve as a guide in the determination of obviousness. Generally, section 102(a) (prior patents, publications, knowledge or use); section 102(e) (description in prior co-pending patent application that ripens into a patent); section 102(g) (prior invention); and section 102(f) (derivation from another) serve as prior art sources commonly relied upon to show obviousness. 2 Donald S. Chisum, *Patents*, § 5.03[3] (1992). Where a person obtains an idea from another source which, when combined with the relevant prior art and the ordinary level of skill in the art, renders the claimed invention obvious, the patent is invalid under § 103. 2 Donald S. Chisum, *Patents* § 5.03[3][d] (1992). The derived information constitutes prior art under § 102(f) even if it is secret, has not been reduced to practice, or is abandoned. *Id.* at § 5.03[3][c].

■■■ The test for obviousness differs significantly from that for novelty. Prior art references are evaluated not only for what they explicitly state but for what they teach to a person of ordinary skill in the art, and the relevant prior art is addressed collectively to determine its teachings as a whole.

---

**11.** Food Science is an academic curriculum comprised of several disciplines, including food processing and preservation, food engineering, food microbiology, and product development.

*EWP Corp. v. Reliance Universal, Inc.,* 755 F.2d 898, 225 U.S.P.Q. 20 (Fed.Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). An inoperative or unworkable device or patent is part of the prior art for all that it teaches. *Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 13 U.S.P.Q.2d 1301, 1304 (Fed.Cir. 1989).

■ In addition to the prior art references cited by the applicants and the Examiner during the prosecution of the '084 Patent, the court finds the following references highly relevant to a determination of obviousness under § 103:

1. Edgar Matsler's cutting device for waffle-shaped potato slices and the product produced therefrom;

2. Murray Jayne's cutting device for waffle-shaped potato slices and the product produced therefrom;

3. The "Strong Patent," U.S. Patent 3,397,993 (1968), which was issued to Kenneth Strong in 1968 and was used by potato processing facilities in the production of McDonald's ¼ inch french fries.

The Strong Patent describes a parfry process in which the potato slices are steam-blanched, air-dried, parfried, and then frozen. The process is used in the preparation of the ¼ inch, shoe-string french fries sold at McDonald's Restaurants and would have been familiar to a person of ordinary skill in the art at the time of the waffle-fry invention.

The record contains clear and convincing evidence that the Matsler and Jayne cutting devices produced waffle-cut potato slices of sufficient thickness to be processed as french fries. The correspondence exchanged between Matsler and Lamb–Weston indicates that the device was intended to cut french fries, not potato chips. Lamb–Weston and the J.R. Simplot Company were fascinated by Matsler's device and immediately realized its obvious potential. Both companies sought to obtain a licensing agreement from Matsler after seeing a demonstration of the machine. Considering the substantial amount of prior art relating to lattice-shaped potato chips, it is inconceivable that these companies would have exhibited such keen interest in Matsler's device if it had not produced a slice of sufficient thickness to prepare as a french fry. Jayne's device evoked similar enthusiasm from Lamb–Weston's Research and Development Department.

That the cutting devices were too crude to be immediately adaptable for commercial production does not prevent the court from considering them as prior art under § 103. What is relevant is the information that the Matsler and Jayne devices disclosed to the inventors., i.e., waffle-shaped potato slices of approximately ¼ inch thickness from peak to peak.

### c. Differences Between the '084 Patent and the Prior Art.

■ An invention must be construed not only in the light of the claims, but also with reference to the prosecution history in the Patent Office. *Graham,* 383 U.S. at 33, 86 S.Ct. at 701. "Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art, and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent." *Graham,* 383 U.S. at 33, 86 S.Ct. at 702; *Hi–Life Products v. American Nat. Water–Mattress Corp.,* 842 F.2d 323, 6 U.S.P.Q.2d 1132 (Fed.Cir.1988) (patentee cannot rely on dropped claims that would resurrect subject matter given up during prosecution to overcome rejections based on prior art).

The Examiner rejected the claims in the '366 Application under § 103, finding the claimed invention unpatentable over Starke,[12] Regnier,[13] Stahmer,[14] Stahmer (I),[15] Toland et al.,[16] and Urschel,[17] when viewed in light of Boon.[18] The Boon patent related a method

---

12. Canada Patent 898,057 (1972).

13. U.S. Patent 678,514 (1901).

14. U.S. Patent 2,612,453 (1956).

15. U.S. Patent 2,767,752 (1956).

16. U.S. Patent 1,937,049 (1933).

17. U.S. Patent 3,139,130 (1964).

18. U.K. Patent 1,506,166 (1978).

for preparing frozen, partially cooked, french fries. According to the Examiner, it would have been obvious to one of ordinary skill in the art to freeze the lattice-shaped potato products disclosed in the primary references as suggested by Boon.

On appeal from the Examiner's rejection, the applicants admitted that the six primary references disclosed lattice-shaped potato slices, but strongly emphasized that the disclosures were limited to "potato chips" with a maximum thickness of no greater than ⅛ inch and had "nothing more in common with the claimed product than a lattice-type configuration." (Exhibit 161). The applicants distinguished the claimed invention from the primary references by noting that the former was suitable for reconstitution by cooking, was a frozen food product rather than a dry snack-type food, had a variable thickness with specified ranges for oil and solids content. While the Examiner considered these differences to be obvious matters of choice, the applicants claimed that the differences were critical to the production of a final reconstituted product having an entirely different character than prior lattice-type potato chips or other potato products.

In reversing the Examiner's rejection, the Board of Patent Appeals and Interferences expressly found that the Examiner committed clear error in cavalierly dismissing the claim limitations and in failing to give adequate consideration to the objective evidence of nonobviousness proffered by the applicants. Most critical to the Board's decision was the Examiner's failure to establish the requisite motivation which would lead one having ordinary skill in the art to freeze a conventional thin potato chip and then reconstitute it by subsequent cooking.

The motivation found lacking by the Board is supplied by the Matsler and Jayne devices and the Strong Patent. When the prior art references cited by the Examiner are combined with the Matsler and Jayne devices and viewed in light of the Strong Patent, the obviousness of the claimed invention is inescapable. Indeed, the prior art suggests the desirability and the obviousness of making such a combination.

Frozen, parfried french fries of various configurations and degrees of thickness were well known in the art at the time of the claimed invention. Major potato processors such as Lamb–Weston and McCain were producing frozen, parfried french fries in thicknesses varying from less than a quarter of an inch to more than a half of an inch. Typically, the fries were prepared by either a conventional process or a "dry fry" process. If a conventional process was used, the fries were blanched [19], parfried,[20] and then frozen. In a "dry fry" process, a drying step would follow the blanching.[21] The two most common dry fry processes used by potato processors were taught by the Strong and Chase patents. Fries prepared by the Strong process were placed in a water or steam blanch and then air-dried to remove moisture. Following the drying step, the slices were parfried and then frozen. The Chase method is similar but eliminates the step of parfrying. Cooking times and temperatures vary depending on the thickness of the slice and the condition of the raw potato product.

While it may not have been obvious to jump from the prior art lattice-chips to a frozen, parfried lattice-fry, Matsler's disclosure of a lattice-cut fry closed this gap. It would have been obvious to one of ordinary skill in the art to take a prior art waffle-cut potato fry, cut it so that the peak to peak thickness falls within the standard ⁴⁄₁₆ to ¹⁰⁄₁₆ inch range for french fries, and apply a parfry process commonly used in the industry, in order to develop a frozen, parfried waffle-cut potato product suitable for reconstitution by finish frying. This is exactly what the Research and Development group at Lamb–Weston did following the demonstration of Matsler's apparatus on January 25, 1980. Subsequent experimentation with processing

---

**19.** Blanching inactivates enzymes and controls sugar levels at the surface of the strip to control the color in finished product.

**20.** For parfrying, the potato slices are usually placed on a conveyor belt and passed through a bath of hot oil.

**21.** During the drying step, hot air is blown across the surface of the product to evaporate moisture from the potato. Drying helps improve the surface texture of the product.

techniques and sequences, including cooking times and temperatures, served merely to "fine tune" the quality of the ultimate product. The limitations in the claims regarding thickness, solids content, and oil content are standard ranges for all frozen, parfried french fries regardless of configuration.

Further evidence of obviousness is the fact that McCain's expert, Merle Weaver, was able to prepare a frozen, parfried waffle fry meeting all limitations of the '084 Patent, without experimentation and without reference to the patent. Lamb–Weston's competitors, Ore–Ida, Cavendish Farms, and McCain, had all developed a frozen, parfried waffle french fry prior to the issuance of the '084 Patent. That others were able to develop a waffle-fry before the teachings of the '084 Patent were disclosed to the public strongly suggests that the invention was obvious.

The court concludes that the information disclosed by the Matsler and Jayne devices, when combined with the teachings of the Strong Patent and the ordinary level of skill in the art, renders the claims of the '084 Patent obvious.

d. *Objective Evidence of Nonobviousness.*

The plaintiff's proffered evidence of nonobviousness is insufficient to overcome the substantial evidence establishing obviousness. The court cannot find that the commercial success of the CrissCut is solely attributable to the invention itself, when Lamb–Weston spent substantial sums on advertising and threatened to sue every competitor that attempted to introduce a waffle-cut product into the market.

There is no real proof of long-felt need, failure of others, or copying. While the intense competition in the industry fostered a constant search for unique specialty products, there was no particular need for a waffle-cut fry. Simplot's lack of success in developing a waffle-fry product was due to mechanical failures in equipment design and an unwillingness to invest the time and effort to fabricate a commercially viable cutting

apparatus. The evidence shows that McCain, Cavendish Farms and Ore–Ida were able to produce the claimed invention without copying the CrissCut.

Evidence of unexpected results is unpersuasive. One of ordinary skill in the art would expect a potato product with thin and thick portions to have both crispy and mealy portions upon reconstitution by cooking. One would also expect that the perforated design of the waffle-fry would provide greater yield and plate coverage than a solid product. That the product exhibited better taste and texture characteristics and had a higher yield than initially anticipated is a difference in degree rather than kind.

The court concludes, based on the clear and convincing evidence before it, that claims 1 through 4 of the '084 Patent would have been obvious to a person of ordinary skill in the art at the time of the invention and are therefore invalid under 35 U.S.C. § 103. To hold otherwise would have the effect of removing existent knowledge from the public domain and restricting free access to materials already available, in contravention of the policy behind the patent laws. *Graham v. John Deere Co.,* 383 U.S. 1, 6, 86 S.Ct. 684, 688, 15 L.Ed.2d 545 (1966).

### 3. *Joint Inventorship Defense.*

 McCain contends that Edgar Matsler and Murray Jayne were co-inventors of the '084 invention and that the failure to name them in the patent application renders the '084 Patent invalid under 35 U.S.C. §§ 102(f) and 116. Section 102(f) precludes patentability if the patent applicant "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). Section 116 requires co-inventors to file a joint application, with each inventor making the required oath.[22] Once a patent issues, however, it is presumed valid and one attacking its validity based on improper inventorship designation carries the burden of establishing misjoinder or nonjoinder of inventors by

---

22. Section 116 provides:
 When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though

(1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

clear and convincing evidence. *Garrett Corp. v. United States*, 190 Ct.Cl. 858, 422 F.2d 874, 880, 164 U.S.P.Q. 521, *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970).

■ To be a joint inventor, one must do more than merely suggest a desirable result without the means of accomplishing it. *Garrett Corp.*, 422 F.2d 874 at 881 ("Joint invention connotes collaboration of effort to produce a complete and operative invention."). "The suggestion or conception of an idea or appreciation of a result to be accomplished, rather than the means of accomplishing it, particularly when the means constitute an essential part of the invention, does not constitute joint or sole inventorship." *Huck Mfg. Co. v. Textron, Inc.*, 187 U.S.P.Q. 388, 407 (E.D.Mich.1975).

> A joint invention is the product of collaboration of the inventive endeavors of two or more persons working toward the same end and producing an invention by their aggregate efforts. To constitute a joint invention, it is necessary that each of the inventors work on the same subject matter and make some contribution to the inventive thought and to the final result. Each needs to perform but a part of the task if an invention emerges from all of the steps taken together. It is not necessary that the entire inventive concept should occur to each of the joint inventors, or that the two should physically work on the project together. One may take a step at one time, the other an approach at different times. One may do more of the experimental work while the other makes suggestions from time to time. The fact that each of the inventors plays a different role and that the contribution of one may not be as great as that of another, does not detract from the fact that the invention is joint, if each makes some original contribution, though partial, to the final solution of the problem.

*Monsanto Co. v. Kamp*, 269 F.Supp. 818, 154 U.S.P.Q. 259 (D.D.C.1967).

■ Neither Matsler or Jayne claim to have invented the waffle or lattice configuration for french fries. Matsler had purchased waffle-shaped fries in the 1930s from the Gem Cafe in Plainsville, Texas. The waffle fries at the Gem Cafe were hand-cut and cooked fresh, without parfrying or freezing. Inspired by the memory of this unique-tasting fry, Matsler invented a machine that he thought would cut waffle-shaped fries at a capacity sufficient for commercial use. He then contacted several potato processing companies, including Lamb–Weston, and suggested that they use his cutting apparatus and the unique potato product in their pre-sliced, frozen food business.

While Matsler conceived the idea for the claimed invention, Lamb–Weston reduced it to practice. Matsler and Jayne admit that they lacked the expertise to make any suggestions regarding the operative steps to be employed in order to obtain the desired result. The contributions of Matsler and Jayne are insufficient to confer upon them joint inventorship status.

### 4. *Enablement and Definiteness under § 112.*

Section 112 of Title 35 [23] requires a patent specification to contain a written description of the invention and the manner of making or using it, "in such full, clear, concise, and exact terms as to enable any person skilled in the art to make and use the invention." The specification must also "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.

The purpose of section 112 is to ensure "that others may construct and use the invention after the expiration of the patent and that the public be informed during the life of the patent of the limits of the monopoly asserted so that the public may know which features may be safely used or manufactured

---

**23.** 35 U.S.C. § 112 in relevant part provides:
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it pertains, or with which it is most nearly connected, to make and use the same, and shall set for the best mode contemplated by the inventor of carrying out his invention.
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

without a license and which may not." *Stearn v. Superior Distributing Co.*, 674 F.2d 539, 543–44, 215 U.S.P.Q. 1089 (6th Cir.1982). The requirements essentially protect the patentee while still encouraging experimentation in areas not covered by the patent.

### a. *Enablement.*

■ The defendants contend that the patent is invalid due to its failure to provide an enabling disclosure under the first paragraph of 35 U.S.C. § 112. In order to satisfy the enabling requirement under 35 U.S.C. § 112, the patent specification must disclose the invention in terms sufficient to enable those skilled in the art to make and use it. *In re Buchner*, 929 F.2d 660, 661, 18 U.S.P.Q.2d 1331 (Fed.Cir.1991). "The specification need not disclose what is well known in the art." *Id.*

■ While the claims of the '084 Patent do not particularly describe how to prepare or process the frozen, parfried potato product, the specifications immediately proceeding the claims teach one method for reaching the claimed result. It is clear from the evidence produced at trial that there are several means by which one of ordinary skill in the art could produce a waffle-fry meeting all the limitations of the claimed invention. The ranges for oil and solids content are those typically found in french fries and serve merely as objective criteria by which to measure the quality of the product. A person with ordinary skill in the art could produce the claimed invention by simply applying processes well known in the art. Though some experimentation may be required to achieve the desired result, this seems to be standard in the industry. Processing techniques are monitored and adjusted on a daily basis, depending on the condition of the raw potato product.

### b. *Definiteness.*

■ Defendants also contend that the claims provide an insufficient description of the subject matter claimed in the patent. A patent will not be invalidated for the use of imprecise words if they reasonably describe the claimed subject matter to those of skill in the field of the invention and distinguish the claimed subject matter from the prior art.

*Andrew Corp. v. Gabriel Electronics, Inc.* 847 F.2d 819, 6 U.S.P.Q.2d 2010 (Fed.Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988).

> If the claims, read in the light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more.

*Andrew Corp.*, 847 F.2d at 822 (citing *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624, 225 U.S.P.Q. 634, 641 (Fed.Cir.), *cert. denied*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985)); *Georgia–Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136, 118 U.S.P.Q. 122, 132 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

■ Claims 1 through 4 of the patent disclose a frozen, parfried potato product, suitable for reconstitution by cooking. Claim 1 describes the ellipsoidal shape and open lattice structure of the potato slice, and specifies a peak to peak thickness within the range of "about $\frac{4}{16}$ to $\frac{10}{16}$ inch." The limitations set forth in Claim 1 specify that the parfried product, prior to reconstitution, must have an oil content of about 6–20 percent, by weight, and a solids content of about 32–40 percent, by weight. Upon reconstitution, the claimed invention must possess certain characteristics, including "very thin, crisp portions of locally increased oil flavor adjacent the openings, relatively thick portions defined by intersecting ridges having an internal mealy texture and strong potato flavor similar to thick-cut french fried potato strips, and portions of intermediate thickness whose characteristics are similar to french fried shoe string potato strips."

Claim 2 limits the invention to a potato product having an oil content of about 16–20 percent, by weight, and a solids content of about 55–65 percent, by weight, after oil fry reconstitution at a temperature within the range of about 350 F. to 360 F. for about 135 to 165 seconds. Claim 3 merely limits the product to one having characteristics akin to thick french fries, potato chips and french fried shoe string potato strips. Claim 4 sets forth a preferred peak to peak thickness of about $\frac{7}{16}$ inch.

The claims, when read in light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention. Thus, the claims are not invalid under 35 U.S.C. § 112.

c. *Fraudulent Procurement/Inequitable Conduct.*

■ The relationship between a patent applicant and the examiner is one of trust and confidence requiring the highest standards of honesty and candor on the part of the applicant. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Trilogy Communications,* 754 F.Supp. at 509.[24] If the duty of disclosure is violated in connection with the application for a patent, the claims of the patent are rendered unenforceable. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556, 1563, 11 U.S.P.Q.2d 1750 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990). A finding of inequitable conduct requires proof by clear and convincing evidence of (1) material prior art or other information that was not disclosed to the Patent Examiner and (2) an intent on the part of the applicant to mislead the examiner. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 872, 9 U.S.P.Q.2d 1384 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

■ Undisclosed information is material if "there is a substantial likelihood that a reasonable examiner would have considered the omitted or false information important in deciding whether to allow the application to issue as a patent." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1578 (Fed.Cir.1984). If the undisclosed prior art is merely cumulative of disclosed references, it is immaterial. *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1107, 231 U.S.P.Q. 185 (Fed.Cir.1986).

■ In reversing the Examiner's determination of obviousness, the Board heavily relied on the inventors' representation that the primary prior art references were limited to potato chips.[25] The inventors advised the PTO that they were unaware of any type of lattice, corrugated-style potato product ever having been made, other than their claimed invention. The Board "found it somewhat unrealistic to conclude that one having ordinary skill in the art would have been led to freeze a conventional thin potato chip and then reconstitute it by subsequent cooking." (Exhibit 161). Had the Board been apprised of Matsler and Jayne's cutting devices, which clearly produced french fries rather than chips, the patent would not have been granted. The Matsler and Jayne devices supply the motivational link found absent by the Board. Thus, the undisclosed information was highly material.

The record is replete with evidence establishing the inventors' intent to deceive the PTO. Sloan and Wheeler were present at the demonstration of Matsler's machine in January 1980, and supervised the processing experiments that were conducted that day. When Sloan observed pictures of the product sliced on Jayne's apparatus, he advised Blakely to arrange a demonstration. Sloan and Wheeler were intimately involved in the evaluation of the Jayne device after negotia-

---

24. The duty of disclosure and candor is codified in 37 C.F.R. § 1.56, which in pertinent part provides:

> A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is mate-

rial where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

25. In their brief on appeal, the applicants argued that prior art lattice products were limited to potato chips no greater than ⅛ inch thick, with the vast majority having a thickness significantly less than that. In his November 1, 1985 affidavit, Sloan stressed that the claimed invention was "at least two times and more typically three or more times that of even the thickest potato chips."

tions for a licensing agreement with Matsler were terminated. Julian was not assigned to the waffle-fry project until the summer of 1981, but he was familiar with the work done on the Matsler and Jayne machines prior to that time. Lamb–Weston was still contemplating whether to modify the Jayne apparatus in 1982. Undoubtedly, each of the inventors knew about the Matsler and Jayne devices and the french fry products produced therefrom.

Before the patent application was submitted to the PTO, Sloan conducted a patent search to determine if any patents had been issued to Matsler or Jayne. Sloan also reviewed Matsler's prior patent application to see if it made any reference to a waffle product. That such a search was conducted indicates that the applicants knew this information was material to the Examiner's decision. When asked why this information was withheld from the PTO, Sloan explained that the inventors did not consider the Matsler and Jayne references to be prior art since no patents had been issued for the devices. According to Sloan, the inventors believed that prior art was limited to previously issued patents. The court finds this explanation incredible.

Before signing the declaration in support of the patent application, the applicants were advised of the duty of disclosure and warned of the consequences attending its breach. By letter dated August 19, 1983, Ramon Klitzke advised the applicants of the following:

We want to call to your attention an important duty on the part of each inventor, their attorney, and everyone involved in the preparation and prosecution of a patent application to disclose to the Patent and Trademark Office *any information (such as: prior use, offers for sale, patents or publications)* of which they are aware that is material to the patentability of the invention claimed in the application. Failure to fulfill this duty of disclosure may seriously jeopardize the validity of any patent which ultimately results from the application.

(Exhibit C–2). This letter is sufficiently clear to have removed any erroneous assumptions the inventors may have had concerning the definition and scope of the prior art.[26]

The court finds that the inventors withheld material information regarding the Matsler and Jayne devices with the intent to mislead the Examiner. Having found that the inventors violated their duty of disclosure and candor, the court concludes that the claims of the '084 patent are unenforceable.[27]

## IV.

Lamb–Weston claims that McCain's production of its SuperChip constitutes unfair competition and trademark infringement under common law, and false description and false designation of origin in violation of state law and § 43 of the Lanham Act, 15 U.S.C. § 1125(a) (1988).[28] Lamb–Weston's claims

---

26. Sloan's explanation is further discredited by the fact that he had previously been granted a patent on an application in which he cited two publications as relevant prior art. (Exhibit 837).

27. The evidence is not sufficient to establish the complicity of Lamb–Weston's patent counsel in the inventors' scheme to defraud the PTO. Though the Klarquist firm was aware of the Matsler and Jayne devices through Klarquist's involvement in the negotiations for licensing agreements, there is no evidence that the attorneys ever saw the devices or had an understanding of whether they differed from the disclosed patents. The evidence indicates that Lamb–Weston's patent counsel believed the prior art actually disclosed to the PTO to be as pertinent to the Examiner's decision as the Matsler and Jayne references. The defendants have not established, by clear and convincing evidence, that the attor-

neys committed a knowing, willful and intentional act of misrepresentation before the PTO.

28. Section 43(a) in pertinent part reads:

Any person who, on or in connection with any goods or services . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qual-

relate to the shape, style and overall appearance of its lattice fry, not the CrissCut name.[29]

## A. § 43 OF THE LANHAM ACT.

▄▄▄▄ The purpose of the Lanham Act is to make actionable the deceptive and misleading use of marks in commerce and to protect those engaged in commerce against unfair competition. *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, —, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). The Act extends protection to unregistered trademarks by making the general principles qualifying a mark for registration under § 2 of the Act applicable to unregistered marks. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 858, 102 S.Ct. 2182, 2190, 72 L.Ed.2d 606 (1982). To prevail on a claim under § 43, a plaintiff must show that its trademark or tradedress is protectable and that the defendant's use of the same or a similar mark is likely to cause confusion. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 841, 4 U.S.P.Q.2d 1026 (9th Cir.1987).

### 1. *Protectability.*

▄▄▄▄ Section 1127 of the Lanham Act defines a trademark as including "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. To be eligible for protection under § 43, a mark must meet two requirements: (1) it must be inherently distinctive or have acquired distinctiveness through secondary meaning, and (2) it must be nonfunctional. *Two Pesos, Inc.,* — U.S. at —, 112 S.Ct. at 2758.

### a. *Distinctiveness/Secondary Meaning.*

▄▄▄▄ Marks are classified in five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Id.* at —, 112 S.Ct. at 2757. Marks that are suggestive,[30] arbitrary, or fanciful,[31] and therefore intrinsically serve to identify the source of a product, are deemed inherently distinctive and are entitled to protection, without a showing of secondary meaning. *Id.* Descriptive marks,[32] while not inherently distinctive, can acquire distinctiveness through secondary meaning.[33] Generic marks[34] are not entitled to trademark protection, under any circumstances. *Id.* at —, 112 S.Ct. at 2757; *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.,* 601 F.2d 1011, 1014 (9th Cir.1979) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985)).

▄▄▄▄ There is nothing suggestive, fanciful or arbitrary about a lattice configuration,

---

ities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1982), *as amended by* Act of Nov. 16, 1988, Pub.L. 100–667, Title I, § 132, 102 Stat. 3946.

**29.** While the CrissCut is commonly referred to as a "waffle-fry," the term "lattice" more accurately describes its configuration. The "waffle fry" moniker was first used by Mr. Matsler and was subsequently adopted by Lamb–Weston.

**30.** A suggestive mark "suggests rather than describes an ingredient, quality, or characteristic of the goods and requires imagination, thought, and perception to determine the nature of the goods." *Surgicenters of America, Inc. v. Medical Dental Surgeries,* 601 F.2d 1011, 1014–15 (9th Cir.1979) (citing *Abercrombie & Fitch Co. v.*

*Hunting World, Inc.,* 537 F.2d 4, 9–10 (2d Cir. 1976)).

**31.** Arbitrary or fanciful marks are those invented solely for their use as trademarks. *Surgicenters of America,* 601 F.2d at 1015.

**32.** A descriptive mark is one that "describes a characteristic or ingredient of an article or service." *Surgicenters of America,* 601 F.2d at 1014.

**33.** Secondary meaning exists if, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos, Inc.,* — U.S. at — n. 4, 112 S.Ct. at 2756 n. 4 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)).

**34.** Generic marks are those that merely refer to the genus of which the particular product is a species. *Surgicenters of America,* 601 F.2d at 1014.

even when applied to potato products. Interestingly enough, Webster's Third New International Dictionary (1967) defines "lattice" as, inter alia, a "regular geometrical arrangement of points or objects over an area or in space" or "something resembling a lattice: as ... 'potato slices perforated in cutting to resemble latticework (lattice potatoes).'" During the prosecution of the '084 Patent, Lamb–Weston admitted that the basic configuration of the CrissCut is generic and indistinguishable from the prior art potato chips. (Exhibits 703, 704). The genericness of the lattice configuration is not diminished by the variation in thickness or the method of processing employed. No one should have the right to take a common geometrical shape out of the public domain and claim exclusive right to its use, regardless of the amount of time, money or effort spent on the production or promotion of the product. *Surgicenters of America,* 601 F.2d at 1016.

Even if the court found the shape, style or overall appearance of the CrissCut to be descriptive, rather than generic, Lamb–Weston has failed to prove that the product has acquired secondary meaning. Lamb–Weston typically sells its lattice fry under private label in the retail market. In the food service market, consuming patrons associate the lattice fry with the particular restaurant in which they purchase the product. Since restaurant patrons and grocery store customers do not know the source of the product, the CrissCut cannot have acquired secondary meaning at the consumer level.

Lamb–Weston has also failed to prove that buyers at the distributor level associate Lamb–Weston as the source for all lattice fries. Lamb–Weston introduced its CrissCut product in 1983 and began distribution on a national scale in 1984. Lamb–Weston's own documents indicate that some of its competitors were offering samples of lattice-cut potato fries as early as November 1983. (Exhibits 797, 798). By 1987, Ore–Ida, McCain, Simplot, Cavendish and Carnation had all developed a lattice-cut potato product. With the abundance of lattice-cut products in the market, it is implausible that the sophisticated buyers at the distributor level would associate lattice products exclusively with one source.

While "copying is relevant to a determination of secondary meaning and, in appropriate circumstances, may suffice to support an inference of secondary meaning," the lattice shape is not original to Lamb–Weston. Lamb–Weston concedes that lattice-shaped potato products have been known since at least the early 1900s. The evidence demonstrates that lattice-shaped french fries were a staple menu item at restaurants such as the Gem Cafe in Plainsville, Texas and the Plaza Restaurant in Quincy, Illinois, long before Lamb–Weston introduced its CrissCut fry. In 1981, General Slicing/Red Goat Disposers, a restaurant equipment supplier, began selling food processors with blade attachments for cutting lattice-shaped potato slices.

The court finds that secondary meaning does not exist at the consumer or distributor level since neither consumers or distributors associate the product configuration of the lattice fry with one particular source. Thus, the product is not entitled to trademark protection regardless of whether it is generic or descriptive.

b. *Functionality.*[35]

 In determining functionality, a product's trade dress is analyzed as a whole. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d at 842. A product feature is functional, and thus unprotectable, if it is essential to the product's use or affects the cost or quality of the article. *Id.* at 842. If a design is "one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection," it is legally functional. *Two Pesos, Inc.,* —— U.S. at ——, 112 S.Ct. at 2760 (citing *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 426 (5th Cir.1984). The purpose of the nonfunctionality requirement is to assure that competition will not be stifled by the exhaustion of a limited number of designs. *Id.* at ——, 112 S.Ct. at 2760.

---

**35.** The court's findings with respect to genericness and secondary meaning obviate the need to address the issues of functionality and likelihood of confusion. Principles of judicial economy, however, dictate that the court render its decision on these issues.

In prosecuting the patent application for its lattice-cut potato product, Lamb–Weston fervently boasted the product's utilitarian advantages which it claimed were directly attributable to the product's configuration. These advantages, which are also touted in Lamb–Weston's advertising, include: superior yield, excellent plate coverage, unique and distinctive appearance, upscale image, great flavor and texture, exceptional textural holding ability, and longer shape retention. The evidence suggests that these boastful claims are not mere commercial puffery. Lamb–Weston employees believe these advantages exist and that they are in large part, if not entirely, attributable to the shape of the CrissCut.

Because the product's configuration provides several advantages to the customer, including better plate coverage, shorter cooking time, greater heat retention, and higher yield, it affects the cost and quality of the product and is therefore functional.

### 2. *Infringement.*

To establish liability for trademark infringement, a party must demonstrate that there exists a likelihood of confusion between it and a competing mark. *Two Pesos, Inc.,* —— U.S. at ——, 112 S.Ct. at 2758. "Likelihood of confusion 'exists when customers viewing the mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark.'" *Fuddruckers,* 826 F.2d at 845. Unless the public is likely to be deceived or confused by the similarity of the marks, no infringement exists. *Two Pesos, Inc.,* —— U.S. at ——, 112 S.Ct. at 2758; *New West Corp. v. NYM Company of California, Inc.* 595 F.2d 1194, 1201, 202 U.S.P.Q. 643 (9th Cir.1979).

As discussed above, consuming patrons associate a product with a particular restaurant and are not typically concerned with the source of the product. Since they do not have a particular brand in mind, they cannot be confused. "[A] buyer cannot be 'confused' where, as here, he or she does not recognize the product shape as a symbol of origin." *Universal Frozen Foods, Co. v. Lamb–Weston, Inc.,* 697 F.Supp. 389, 395, 7 U.S.P.Q.2d 1856 (D.Or.1987).

There is no likelihood of confusion among distributors because they know the identity of the company from which they purchase the product. *Id.* Michael Neal, Lamb–Weston's production manager, concedes that buyers at the distributor level are sophisticated enough to know from whom they are buying the product.

Lamb–Weston's claims under the Lanham Act must fail because the overall configuration of the CrissCut is generic and functional, and there is no likelihood of confusion between the CrissCut and McCain's SuperChip.

### B. R.C.W. 19.77.160.

To prevail on its claim for trademark dilution under R.C.W. 19.77.160, a plaintiff must show that its mark is distinctive.[36] As discussed above, Lamb–Weston has failed to establish the distinctiveness of the shape, style or overall appearance of the CrissCut. Accordingly, its trademark dilution claim necessarily fails.

### V.

Each side has asked the court to declare this case exceptional under 35 U.S.C. § 285 and 15 U.S.C. § 1117. Both 35 U.S.C. § 285 and 15 U.S.C. § 1117 permit the court to award reasonable attorney fees to the prevailing party in an exceptional case. *Wa-*

---

**36.** Factors relevant to a determination of distinctiveness under R.C.W. 19.77.160 include the following:

(1) Whether the mark is inherently distinctive or has become distinctive through substantially exclusive and continuous use;

(2) Whether the duration and extent of use of the mark are substantial;

(3) Whether the duration and extent of advertising and publicity of the mark are substantial;

(4) Whether the geographical extent of the trading area in which the mark is used is substantial;

(5) Whether the mark has substantial renown in its and in the other person's trading areas and channels of trade; and

(6) Whether substantial use of the same or similar marks is being made by third parties. R.C.W. 19.77.160.

*ter Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660 (Fed.Cir.1988); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir.1985). The decision to award attorney fees is within the discretion of the court. *Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547 (Fed.Cir.1989).

The invalidity and unenforceability of the '084 Patent precludes Lamb–Weston's recovery of damages or attorneys' fees under 35 U.S.C. §§ 284 and 285, notwithstanding the defendants' infringement.

To be entitled to an award of attorney fees, defendants must establish, by clear and convincing evidence based on the totality of the circumstances, that Lamb–Weston engaged in bad faith litigation. *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 811 (Fed.Cir.1990).

It is urged because of the incredibly inconsistent position of Lamb–Weston in *Universal Frozen Foods, Co.*, 697 F.Supp. 389, that its claims here should not only be regarded as bogus, but exceptionally so.

However, the court, during this trial, reviewed many reported cases involving the select few organizations that comprise this industry and was left with the disturbing conviction that such conduct is not exceptional, but rather the norm! Indeed, the defendant proceeded with total disregard of its possible infringement of plaintiff's rights. The court does not intend to condone this kind of commercial buccaneering, but sees it as sufficiently prevalent as to not require any allocation of shares between freebooters.

Attorney's fees will not be awarded, but the defendants will recover their costs.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment shall be entered in favor of the defendants.

**IT IS SO ORDERED.** The Clerk is directed to enter this order and forward copies to counsel.